IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CHRISTOPHER RAD,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

HONORABLE ANNE E. THOMPSON

Civil Action
No. 15-7740 (AET)

**OPINION**

R E C E I V E D

SEP 0 7 2018

AT 8:30_____M
   WILLIAM T. WALSH
      CLERK

APPEARANCES:

CHRISTOPHER RAD, Petitioner pro se
175 Pike Co. Blvd.
Lords Valley, PA 18428

ALEXANDER EDWARD RAMEY, Esq.
UNITED STATES ATTORNEY'S OFFICE
402 East State Street
Room 430
Trenton, New Jersey 08608
    Attorney for Respondent United States of America

**THOMPSON, District Judge:**

## I. INTRODUCTION

Christopher Rad ("Petitioner") moves to vacate, correct, or
set aside his federal sentence pursuant to 28 U.S.C. § 2255.
(*United States v. Rad*, 3:15-cv-7740, ("hereinafter "15-7740")
ECF No. 1 at 37). Respondent United States of America
("Respondent") opposes the motion. (15-7740, ECF No. 50). For
the reasons stated herein, Petitioner's motion is partially
denied, and no certificate of appealability will issue on the

denied claims.  However, for the reasons discussed *infra*, the Court will conduct a hearing on two of Petitioner's ineffective assistance of counsel claims.

## II.  BACKGROUND

Petitioner was originally charged in the United States District Court for the District of New Jersey, in a one-count indictment to a conspiracy offense. (*United States v. Rad*, 3:2011-cr-161, (hereinafter "11-cr-161") (D.N.J. ECF No. 1.)) Two of Petitioner's co-conspirators, James Bragg and Doyle Scott Elliott, were charged and convicted in separate proceedings in the District of New Jersey.  Petitioner was subsequently charged in a nine-count superseding indictment to two conspiracy offenses and seven electronic mail-related fraud offenses.  (11-cr-161, ECF No. 16.)

Petitioner's conduct related to securities fraud by employing the use of misleading spam[1] emails touting stocks with the objective of selling the stocks to the public at artificially inflated prices.  Petitioner was considered the "middleman between stock promoters seeking to pump shares of stock, and computer experts located inside and outside of the United States who used various means, including spam e-mail

---

[1] Unsolicited bulk commercial e-mail.  (11-cr-161, ECF No. 1 at 6).

campaigns, botnets[2], and hacking to pump the stock." (11-cr-161, ECF No. 1 at 1)(internal quotations omitted).

On November 30, 2012, a jury found Petitioner guilty on six counts: (1) one count of conspiracy to commit securities fraud, false header spamming, and/or false registration spamming in violation of 18 U.S.C. § 371; (2) one count of conspiracy to commit unauthorized access spamming in violation of 18 U.S.C. § 371; (3) and four counts of unauthorized access spamming; aiding and abetting, in violation of 18 U.S.C. § 1037(a)(1). (11-cr-161, ECF No. 68). Petitioner was found not guilty of three counts of false registration spamming; aiding and abetting in violation of 18 U.S.C. § 1037(a)(4) and 2. (*Id.* at 1-2).

Petitioner appeared for sentencing on May 13, 2013. (11-cr-161, ECF No. 104). The Probation Office calculated the offense level to be 32 and the criminal history category as I, resulting in a guideline range of 121-151 months. (PSR ¶¶¶ 120, 123, 150). The Court heard argument regarding the recommended upward departures as well as the government's recommendation for a three-level enhancement based on Petitioner's managerial role in the offense. (11-cr-161, ECF No. 104 at 6-33). Petitioner's counsel objected to the calculations. First, counsel

---

[2] A network of computers infected with malicious software that allowed a third party to control the entire computer network without the knowledge or consent of the computer owners. (11-cr-161, ECF No. 1 at 6).

unsuccessfully argued that the specific offense characteristics
that resulted in an eighteen-level offense increase were
premised on an incorrect loss calculation of $2.8 million. (*Id.*
at 15-20). Petitioner's counsel next successfully objected to
the probation office's two-level upward adjustment
recommendation based on the offense having involved electronic
email addresses. (*Id.* at 20-27). Finally, Petitioner's counsel
unsuccessfully objected to the government's three-level upward
departure recommendation for Petitioner's managerial role in the
offense. (*Id.* at 27-33).

The Court ultimately granted a six-level downward variance
resulting in an offense level of 25. (*Id.* at 65). The Court
concluded a high end-guideline sentence was appropriate and
sentenced Petitioner to 71 months imprisonment followed by five
years of supervised release. (*Id.* at 65-66).

Petitioner appealed to the Third Circuit arguing that "the
District Court denied him a fair trial by misinterpreting the
Controlling the Assault of Non-Solicited Pornography and
Marketing Act("CAN-SPAM")and preventing his counsel from
properly defending his case." *United States v. Rad*, 559 F.
App'x 148, 149 (3d Cir. 2014). The Court of Appeals rejected
this argument and affirmed the sentence. *Id.* at 151.
Petitioner thereafter filed this § 2255 motion. (15-7740, ECF
No. 1). Additionally, Petitioner filed a series of other

motions in his criminal case, all of which were summarily dismissed on October 25, 2017. (11-cr-161, ECF No. 133). The Court subsequently dismissed Petitioner's motion for partial summary judgment on December 13, 2017. (15-7740, ECF No. 32). Moreover, Petitioner's initial § 2255 filing was amended on January 18, 2018. (15-7740, ECF No. 37).

When deciding the motion, the Court considered all of Petitioner's filings which are the: original petition filed on October 28, 2015 (15-7740, ECF No. 1); supplement to the motion to vacate/set aside/correct sentence filed on November 9, 2015 (15-7740, ECF No. 4); an amended petition filed on January 18, 2018 (15-7740, ECF No. 37); "Petitioner's Habeas Petition in Lieu of Government's Answer" filed on May 21, 2018 (15-7740, ECF No. 45); a traverse filed on July 18, 2018 (15-7740, ECF No. 51); and "Submission to Court of Letter to Mr. Ramey" filed on August 1, 2018. (15-7740, ECF No. 52). Respondent filed an answer asserting that the claims should be denied on the merits on June 29, 2018. (15-7740, ECF Nos. 50).

Petitioner raises six grounds for this Court's consideration: (1) trial counsel was ineffective for "failing to impeach the knowing use of false, perjured and conflicting testimony"; (2) prosecutor's failure to disclose potential impeachment evidence against its witness constituted misconduct; (3) (a) trial counsel was ineffective for failing to advance a

meritorious defense and (b) for failing to advise Petitioner of

his potential sentence exposure if convicted at trial; (4) trial

counsel was ineffective for failing to investigate government

witness, James Bragg's criminal history; (5) trial counsel was

ineffective for failing to "properly move for judgement of

acquittal" on Counts Five through Nine; and (6) trial counsel

was ineffective for failing to "properly move for judgment of

acquittal" on Count One.

For the following reasons, the Court will order an

evidentiary hearing on Claim 3 that raises ineffective

assistance due to trial counsel's failure to advance a sound

defense strategy and failure to advise Petitioner of his

potential sentence exposure but will deny relief on the

remaining claims Petitioner has raised.

## III. DISCUSSION

Section 2255 provides in relevant part that:

[a] prisoner in custody under sentence of a court
established by Act of Congress claiming the right to be
released upon the ground that the sentence was imposed
in violation of the Constitution or laws of the United
States ... may move the court which imposed the sentence
to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). A district court must hold an evidentiary

hearing on a § 2255 motion unless the "motion and the files and

records of the case conclusively show" that the movant is not

entitled to relief. 28 U.S.C. § 2255(b); *see also United States*

*v. Booth*, 432 F.3d 542, 545-46 (3d Cir. 2005). Here, the record conclusively demonstrates that Petitioner is not entitled to relief on all but one of his claims because his arguments lack merit.

## A. Prosecutorial Misconduct

Petitioner submits that the prosecution's failure to disclose government witness James Bragg's plea and sentencing transcripts constitutes misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963). Additionally, Petitioner argues in a separate claim that the government's knowing use of Bragg's perjured testimony constituted misconduct. Although Petitioner raises this second argument within the context of an ineffective assistance claim, the gravamen of Petitioner's claim is that the government's misconduct and his counsel's subsequent purported failure to discredit Bragg's inconsistent statements violated his constitutional rights. Petitioner also raises an additional argument that portions of FBI Agent Laurie Allen's trial testimony were untrue and that this could have been impeached had the government provided Petitioner with the purported relevant records to support her testimony. (15-7740, ECF No. 52 at 2-3).

First, allegations involving *Brady*, 373 U.S. 83 are analyzed as a type of prosecutorial misconduct, which requires that certain elements be met. *See Banks v. Dretke*, 540 U.S. 668, 671 (2004).

In that regard, Petitioner "must show that: (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citations omitted). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

When assessing *Brady* violations, the Supreme Court has unequivocally rejected any distinction between impeachment evidence and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678. Additionally, the Third Circuit "recognize[s] that the *Bagley* inquiry requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation." *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (citation omitted).

Allegations involving the prosecution's knowing use of perjured testimony is governed by the rule articulated by the Supreme Court in *Napue v. Illinois*, 360 U.S. 264 (1959). There the Court held that the state violates the Fourteenth

Amendment's due process protection when it "knowingly presents or fails to correct false testimony in a criminal proceeding." *Id.* at 269. Moreover, "[a] conviction must be set aside even if the false testimony goes only to a witness's credibility rather than the defendant's guilt." *Haskell v. Superintendent*, 866 F.3d 139, 146 (3d Cir. 2017). To establish such a claim, Petitioner must show that: (1) "[the witness] committed perjury, (2) the [prosecution] knew or should have known that the testimony was false, (3) the false testimony was not corrected, and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury." *Id.* (citation omitted).

1. Prosecution's Failure to Disclose Bragg's Prior Case Proceeding Transcripts and Plea Agreement

James Bragg, an internet company proprietor who provided spamming services to Petitioner, was eventually charged and convicted as a co-conspirator in the United States District Court for the District of New Jersey. In 2009, Bragg, who was then awaiting sentencing for an unrelated offense in Michigan, agreed to cooperate with the government in their investigation against Petitioner. Bragg was later called by the government to testify at Petitioner's trial. Bragg described the start of his business relationship with Petitioner and the nature of the service he provided. Bragg testified that he was charged and

awaiting the disposition of a case being prosecuted in the Eastern District of Michigan when he began working with Petitioner. He also testified that he was awaiting sentencing in the current conspiracy prosecution pending against him in the District of New Jersey and volunteered to cooperate with the government in their case against the Petitioner. (11-cr-161, ECF No. 81 at 35, 138-40).

Petitioner argues that Bragg's trial testimony was inconsistent with statements he provided at his 2009 debrief with the Assistant United States Attorney ("AUSA") prosecuting Petitioner's case in New Jersey; with Bragg's statements to the Michigan and New Jersey sentencing courts; and with his answers to Petitioner's interrogatories dated four years after Petitioner's trial. (15-7740, ECF No. 37-1 at 2-3).

Petitioner first asserts that Bragg's trial testimony included false statements that he was not in prison for using proxies, and he was not working with the government before his Michigan sentence. (*Id.* at 2).

a. Bragg's Testimony About His Cooperation

At Petitioner's trial, the following colloquy between Bragg and the AUSA took place:

> Q: Did you get sentenced as part of the Ralsky case?
> A: Yes, I did.
> Q: What were you sentenced to?
> A: A year and a day.

10

Q: Did you do any cooporation where you
were given credit for cooperation as part of
the Ralsky case?
A: No.
Q: You were sentenced to a year and a day.
Did you have to serve a sentence as part of
that case?
A: Yes, I did.
Q: When was the sentence, if you remember,
the exact dates or approximate dates, did
you serve with respect to Alan Ralsky?
A: From the end of 2008, roughly end of
2008 until toward the end of 2009, I
believe. I'm sorry, that's incorrect. 2009,
I was released in 2010, in May of 2010.
Q: 2009 to 2010 was the date of your
sentence?
A: Yes.
Q: Before that sentence, were you working
with the Government?
A: No, I was not.

(11-cr-161, ECF No. 81 at 104-105).

Petitioner maintains that Bragg's testimony about his prior

government cooperation and his prior conviction were untruthful.

First, with respect to Bragg's testimony about the tenure of his

government cooperation, Bragg's testimony about when his

cooperation started is not exactly untrue. As previously

quoted, the prosecutor posed the question as follows: "Before

that sentence, were you working with the Government?" At the

time of Bragg's interview with federal prosecutors on August 6,

2009, he was incarcerated at the Federal Bureau of Prisons

Detention Center in Milan, Michigan, awaiting sentencing. (15-

7740, ECF 37-2 at 26). Bragg met with federal prosecutors

during this period of incarceration to discuss his activities

11

with Petitioner. (*Id.*) Petitioner refers to the government's trial exhibit, FBI Form 302, memorializing their August 6, 2009, debrief with Bragg as well as the cooperation agreement dated October 24, 2009, to support his argument that Bragg's testimony that he did not cooperate prior to the start of his sentence constituted perjury.

Petitioner also refers to Bragg's answers to Petitioner's interrogatories filed in 2016. There, Bragg does not contradict his trial testimony by any means. In fact, his answers reflect his failure to recall the exact start of his cooperation. Moreover, despite Petitioner's insistence that Bragg's answer to the interrogatory further supports that Bragg's trial testimony was not truthful; Bragg's interrogatory response that his debrief while at the Milan Detention Center only pertained to Berg's activities, could also just be a result of Bragg's difficulty recalling the details of a then seven-year old meeting.

> Interrogatory No. 12
>
> You answered that you "never talk to anyone about this case until I was in prison." By prison do you mean the prison that you served your sentence in, and NOT the pre-trial holding center in Michigan?
>
> ANSWER: Do not remember exactly when my first talk was. But it was in Milan Prison in Michigan, and these talks did not involve you only your partner Berg.

12

> Please state the location of the prison that
> you served your sentence in.
>
> ANSWER: Michigan and Arizona.
>
> Do you understand that your Michigan
> sentence did not begin until after you were
> sentenced on 11/24/2009, and that you were
> retroactively credited the time you spent in
> the pre-trial holding/detention center?
>
> ANSWER: Yes but due to the time passed I
> can not give you exact dates as I have no
> record of this.

(15-7740, ECF 37-2 at 10).

The record supports Petitioner's submission that Bragg was not sentenced in the Eastern District of Michigan until November 24, 2009. Although Bragg's sentence did not officially begin until his sentence was imposed, Bragg was detained pending sentencing in a federal detention facility at the time of the debrief and subsequent official cooperation agreement. Taken within this context, Bragg's testimony at Petitioner's trial does not suggest dishonesty but rather that he conflated the start of his sentence with the start of any time which he spent in custody in connection with his Michigan offense. Nonetheless, Petitioner maintains in his traverse that Bragg's use of the word "sentence" should be taken in the literal sense and should demonstrate Bragg's willingness to commit perjury at Petitioner's trial. (15-7740, ECF No. 51 at 12-13).

Bragg's testimony about when his government cooperation commenced is not inconsistent or indicative of dishonesty, when assessed within context. Moreover, Petitioner has not established how this truthful testimony renders the government responsible for using purportedly perjured testimony. Petitioner has not met the constitutional standards set in *Napue* and its progeny. Consequently, Petitioner has not established that a *Brady* or *Napue* violation occurred.

> b. Bragg's Testimony About Prior Incarceration for Using Proxies

Petitioner also maintains that Bragg's testimony about his prior conviction is inconsistent with Bragg's 2009 conviction in the Eastern District of Michigan and with his statements during the 2009 debrief. In 2009, Bragg pled guilty to, among other things, bulk e-mailing using proxy[3] computers in violation of 18 U.S.C. § 1037(a)(2). (15-7740, ECF No. 37-2 at 32).

The relevant portion of the statute provides, in part, the following:

---

[3] "Proxy computers could be used by spammers to camouflage the originating IP address of a spammer's e-mail communication because the real IP address of the spammer would be replaced in the header with the IP address of the proxy computers making it difficult for recipients, Internet providers, or law enforcement to trace the spam e-mail through proxy computers to hide their identity, avoid being detected, and evade anti-spam filters and other spam blocking techniques." (11-cr-161, ECF No. 1 at 7).

(a) IN GENERAL. -Whoever, in or affecting interstate or foreign commerce, knowingly-

    (1)   Accesses a protected computer without authorization, and intentionally initiates the transmission of multiple commercial electronic mail messages from or through such computer,

    (2)   Uses a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages,

           or conspires to do so, shall be punished as provided in subsection (b).

18 U.S.C. § 1037.

On cross-examination, the following colloquy between Bragg and defense counsel took place:

> Q: Now, previously in 2008, wasn't it your understanding that Mr. Rad would not use proxies then?
> A: That's not my understanding because he worked with Breg and Breg, it was well known that he used proxies.
> Q: Let me ask you this: With respect - - because you're not Mr. Breg and Mr. Breg is not on the stand. With respect to your, was it your understanding that Mr. Rad would not work with proxies?
> A: No, it was not my understanding.
> Q: Okay. Was it your understanding that Mr. Rad did not want you to use proxies in his e-mail campaigns?
> A: I don't recall it ever being discussed.

> Q:  Well, you did tell him that you were 100
> percent legit, didn't you?
> A:  Yes, I did, on Skype.
> Q:  And illegal proxies would not be 100
> percent legit, would it?
> A:  Proxies are not botnets.  You can have a
> [sic] legal proxies, there are such things
> as legal proxies, not a botnet.  The proxies
> I'm referring to here would be illegal
> proxies or botnet, yes.
> Q:  So in this case, you were suggesting
> using illegal proxies?
> A:  Yes.
> Q:  Even though you just been to prison for
> that?
> A:  I wasn't in prison for using proxies.  I
> was in prison for spamming and security
> fraud.

(11-cr-161, ECF 82 at 90-91).

Respondents submit that Petitioner's claim takes Bragg's testimony about proxies "completely out of context." (15-7740, ECF No. 50 at 16.) This Court agrees. Respondents refer to Rad's own trial testimony where he stressed the difference between legal and illegal use of proxies.

At trial, Petitioner took the witness stand in his defense and provided the following testimony:

> Q:  What equipment do you use or did you use
> during that period?
>
> A:  Actually I have T1 lines run to my house
> with my own IPs.  I have what's called a
> proxy service, a legal proxy service that
> you can send the mail through and I actually
> have about three or four other mailers, mail
> servers that are allowed to send mail from
> my mailing business basically.

> Q: What do you mean by a "legal proxy
> service"?
>
> MR. PAK: Objection, your Honor.
>
> The COURT: Overruled.
>
> A: So if you have an IP and this is another
> IP, when you mail through this IP, it takes
> off your information and puts the other one
> on, okay. So it can be used to hide. When
> you use that without permission, it's not
> legal.

(11-cr-161, ECF No. 86 at 129).

Petitioner's own contrasting definitions of proxies

undermines his argument that Bragg's testimony was dishonest.

According to Petitioner's description of the different types of

proxies, Bragg's testimony seemed to establish that although he

may have used proxies, he was not sentenced for using unlawful

proxies.

Petitioner next argues that Bragg's trial testimony about

his prior conviction is inconsistent with the sentencing

proceedings in the United States District Court for the Eastern

District of Michigan. Petitioner provides portions of the

sentencing transcript to support this premise, however nothing

in the exhibit indicates that Bragg was convicted of using

unlawful proxies. Nonetheless, Respondents delineate the

distinguishing elements of 18 U.S.C. §§ 1037 (a)(1) and (a)(2),

the latter section which Bragg was convicted of in Michigan.

17

> Pursuant to his plea agreement in the
> Michigan case, Bragg pleaded guilty to one
> substantive violation of the CAN-SPAM Act
> under 18 U.S.C. Section 1037(a)(2), and a
> number of related conspiracy charges.
> Section 1037(a)(2) punishes the use of "a
> protected computer to relay or retransmit
> multiple commercial messages, with the
> intent to deceive or mislead recipients, or
> any Internet access service as to the origin
> of such messages."  Thus, although a
> violation of this provision involves the use
> of proxies, it is not established
> unless the proxies are used for an otherwise
> unlawful end.  This contrasts with 18 U.S.C.
> 1037(a)(1), which explicitly punishes the
> use of a computer as a proxy without
> authorization.  In other words, under
> Section 1037(a)(1), the end of sending the
> messages is not important: the act of using
> the computer as a proxy is the violation.

(15-7740, ECF No. 50 at 19).

In other words, one subsection of the statute punishes the use of proxies where another subsection punishes the use of the computer.

In his traverse, Petitioner maintains that notwithstanding the different elements between the two sections of the statute, it "makes little difference as § 1037(a)(2) clearly punishes using proxies, and Bragg testified that he was not in prison for using proxies."  (15-7740, ECF No. 51 at 7) (internal quotations omitted).

Finally, Petitioner argues that Bragg's trial testimony about not being sentenced for using illegal proxies is inconsistent with his statements at his 2010 New Jersey guilty

plea entry hearing where he purportedly admitted to using botnets. (15-7740, ECF No. 45 at 6-7). At that hearing, Bragg admitted to working with third parties who used botnets to distribute spam emails. Bragg's comments at the guilty plea hearing are not necessarily inconsistent with his comments at Petitioner's trial. Nonetheless, Petitioner asserts that these two statements demonstrate Bragg's incredible testimony at his trial.

At his 2010 guilty plea hearing, Bragg engaged in the following colloquy with the judge:

> Q: Also in furtherance of the conspiracy, did you retain third parties, including a computer hacker and spammer located in Russia with the initials B.T. to further disseminate spam e-mails touting the stocks?
> A: Yes, Sir.
> Q: At the time of the conspiracy, were you aware that B.T. used an illegal botnet, that is an illegal network of computers infected with malicious software that allowed him to control the computer network without the computers' owners to distribute spam emails?
> A: Yes.

(15-7740, ECF No. 1-4 at 50-51).

Two years later at Petitioner's trial, Bragg testified to the following:

> Q: You did not use botnets in distribution of the mail did you?
> A: No, I did not.
> Q: And you never represented to Mr. Rad that you would do so, did you?
> A: No, I did not.

19

> Q: Okay. And that's because that would be
> illegal, correct?
> A: That is - - let me answer this followed
> by the question. Can you re-ask that
> questions a little differently?
> Q: You did not use any botnets in the
> distribution of the emails because that is
> illegal, correct?
> A: I didn't use it because I think it's
> unethical to use hacked computers to send e-
> mail. That's why I did not do it.

(11-cr-161, ECF No. 82 at 36).

Bragg's statements expressing his own disinterest in personally using botnets is not inconsistent with using third parties to do so. Once again, Petitioner takes a literal reading of Bragg's comments to support his unfounded perjury allegation.

Petitioner has not established how Bragg's statements about his use of unlawful proxies have been inconsistent. Petitioner's argument that the actual elements of Bragg's 2009 Michigan conviction would serve to better discredit Bragg are belied by the record. The record reflects that Bragg's testimony established that he had a lengthy history of engaging in computer-related crimes. Bragg repeatedly testified about other criminal cases, including the one that was currently pending in the District of New Jersey, and periods of incarceration in correctional facilities as a result of these cases. The transcript of his online conversations with Petitioner, which were admitted into evidence, also indicated

that both men discussed one of Bragg's then-pending criminal cases. Bragg even testified about losing civil actions taken against him by America Online for similar behavior. *See Hollman v. Wilson*, 158 F.3d 177, 181-82 (3d Cir. 1998)(holding that there was no *Brady* violation as a result of Government's failure to disclose witness's criminal record because the jury was made aware of his criminal record and the additional impeachment evidence of his crimen falsi convictions "would not have put the whole case in such a different light as to undermine our confidence in the verdict.") Finally, these statements do not establish that Bragg perjured himself at Petitioner's trial and therefore cannot amount to a meritorious *Napue* claim against the prosecution. Bragg testified that he was not convicted for using proxies in his Michigan case. The prosecution would have had no basis to attempt to correct this testimony, because as Respondents explain in their Answer, Bragg's characterization of his count of conviction was consistent with the letter of the law under 18 U.S.C. § 1037(a)(2).

> c. Bragg's inconsistent statements about working with the petitioner and about not wanting to use computers

Petitioner also cites to a series of statements made by Bragg either at his Michigan sentencing hearing or at his 2009 debrief. Petitioner asserts that these statements constitute *Brady* evidence and the prosecution should have made them

21

available before his trial for defense counsel to successfully impeach Bragg's credibility.

First, Petitioner cites to Bragg's counsel's statement to the Michigan sentencing court that he "wants nothing to do with computers for the balance of his life." (15-7740, ECF 37-1 at 4). According to Petitioner, this statement contradicts Bragg's testimony three years later at Petitioner's trial, where he described himself as a "computer programmer." *Id.* Even if this statement from Bragg's lawyer was to be literally interpreted, Bragg's return to the computer programming field could arguably be a function of necessity rather than a show of his dishonesty to the sentencing court. Moreover, nothing about the computer programming field is inherently illegal and Petitioner has failed to demonstrate how this benign comment would have supported his defense.

Next, Petitioner refers to another one of Bragg's statements at his 2009 Michigan sentencing hearing to illustrate more of Bragg's purportedly dishonest testimony at Petitioner's trial. At the sentencing hearing, Bragg along with his defense counsel engaged in a colloquy with the sentencing judge about his then-pending case in New Jersey. Although Petitioner was not explicitly named, Bragg references the New Jersey case and denies having worked with "him." Petitioner argues that Bragg's denying having worked with him in 2009 was emblematic of his

dishonesty both at his Michigan sentencing proceeding and at Petitioner's trial.

Petitioner's as well as Bragg's charging documents in the District of New Jersey indicate that multiple people were involved in the conspiracy, some of which were identified by name, others by their initials and some that were unidentified. (11-cr-161, PSR ¶ 1, ECF No. 1). Two of those several individuals who were eventually charged in the District of New Jersey, were Petitioner and Doyle Scott Elliott. In light of the multiplicity of individuals involved in the underlying conspiracy that resulted in the charges in the District of New Jersey, Bragg's statements to the Michigan sentencing court are too vague to determine whether they rise to the level of being false statements. (11-cr-161, PSR ¶ 1).

Petitioner has not demonstrated how any of the aforementioned statements were actually inconsistent. Petitioner attempts to support his premise that Bragg's testimony at Petitioner's trial was perjured by repeatedly taking Bragg's pre-trial and post-trial statements out of context, however he has not established how he was prejudiced by these statements as they were not material for *Brady* purposes. *See United States v. Walker*, 657 F.3d 160, 188 (3d Cir. 2011) ("it is only those new avenues of impeachment that sufficiently undermine confidence in the verdict that will make out a

successful *Brady* claim."). Accordingly, because Petitioner has not established that Bragg's statements were untruthful, his *Napue* claim fails as well.

### d. Prosecution's Failure to Disclose Records to Support Agent Allen's Testimony

Petitioner next claims that the prosecution failed to disclose evidence relied on by FBI Agent Laurie Allen, who testified for the government at Petitioner's trial. More specifically, Petitioner contends that Allen's testimony did not support how "she knew of Bragg." (15-7740, ECF No. 52 at 2). Allen testified about the series of ways that she became familiar with Bragg including emails, through payments made from Petitioner to Bragg and by E-Gold records,[4] which were admitted into the trial record as Government exhibit G902. (*Id.* at 3).

Petitioner argues that the only documentary evidence which the government provided that may be able to corroborate Allen's testimony of how she knew of Bragg were illegible "e-gold records." Petitioner maintains that the illegible records, coupled with the rest of Allen's uncorroborated testimony, indicate that Agent Allen was not truthful at Petitioner's trial. The record, however, reflects Agent Allen's trial testimony that she met Bragg at a 2009 interview in an attempt

---

[4] Allen testified that E-Gold is an online money remitter service that uses digital currency. (11-cr-361, ECF No. 85 at 129).

to gain his cooperation with the FBI. (11-cr-161, ECF No. 85 at 143).

Next, Petitioner alleges that Allen's testimony about Trevor Ruiz's existence was false. (15-7740, ECF No. 52 at 3). James Bragg testified on cross-examination that he was not the user behind the Skype screenname "trevman" after trial counsel showed him a Skype dialogue transcript including three users, one of which was "trevman". (11-cr-161, ECF No. 81 at 156-57). There was no further line of questioning on this subject. Agent Allen later testified that the screenname "treveman187" was associated with a Trevor Ruiz who resides in Canada. (11-161, ECF No. 85 at 146-47). The prosecution subsequently asked Agent Allen whether "trevman187" was James Bragg, to which she replied in the negative. (*Id.*)

Petitioner argues that his inability to corroborate Allen's testimony about "trevman187"'s actual identity is a result of her testimony being fabricated. He bases this claim on his independent search for an individual in Canada named Trevor Ruiz that did not yield any positive results. (*Id.*)

Petitioner does not provide any basis to support the claim that Allen committed perjury on the stand. He has not provided any evidence that is contrary to Allen's testimony and he has not demonstrated how her initial knowledge of James Bragg or Trevor Ruiz's existence is material. Moreover, he certainly has

not provided any basis to support his claim that the government was aware of this purported perjury. His bald assertions of suppressed *Brady* evidence and perjury are not supported by the record and not meritorious. Therefore, Petitioner is denied relief with respect to these claims.

Accordingly, all of Petitioner's *Brady* and *Napue* claims are denied.

## B. Ineffective Assistance of Trial Counsel

Grounds One, Three, Four, Five and Six concern Petitioner's trial counsel's representation. The United States Supreme Court has set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).

"The first part of the *Strickland* test requires 'showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *United States v. Bui*, 795 F.3d 363, 366 (3d Cir. 2015) (quoting *Strickland*, 466 U.S. at 687). To satisfy the second "prejudice" prong, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

    i.    Trial Counsel's Failure to Adequately Investigate and Impeach the Government's Witness Was Ineffective Assistance

Petitioner argues trial counsel rendered ineffective assistance when he failed to investigate James Bragg's criminal history and "impeach the knowing use of false, perjured and conflicting testimony." (15-7740, ECF No. 37 at 5). Petitioner raises these two ineffective assistance claims related to James Bragg in grounds one and four of his petition. (55-740, ECF No. 37 at 5, 9).

As discussed in the previous section, Petitioner has not demonstrated that Bragg's trial testimony was inconsistent with his prior statements nor that it was perjured. *See supra* Section A. Therefore, he is not entitled to relief.

Furthermore, Petitioner cannot establish that his counsel's performance fell below an objective standard of reasonableness as the record conclusively demonstrates trial counsel conducted a thorough cross examination of James Bragg. Obtaining Bragg's criminal history would not have undermined his testimony because despite Petitioner's claim that Bragg was previously convicted and sentenced for using illegal proxies, the record proves otherwise. As explained in the previous section, Bragg's Michigan conviction was not for the unlawful use of proxies. Moreover, Bragg consistently denied using illegal proxies including at his 2009 debrief, the memorialization of which Petitioner cites to multiple times throughout his Petition. (15-7740, ECF No. 1-4 at 24).

Petitioner is not entitled to relief under § 2255 on these grounds.

ii. Counsel's Failure to Properly Advise Petitioner of Whether a Valid Defense Exists to 15 U.S.C. § 7702(17) and Subsequent Failure to Communicate Potential Sentencing Exposure if Convicted at Trial was Ineffective Assistance

Counsel's Failure to Advise of a Valid Defense

Petitioner argues that trial counsel rendered ineffective assistance during the plea negotiation process by misadvising him as to the availability of a defense under 15 U.S.C. § 7702(17). (15-7740, ECF No. 1 at 4).

Petitioner's claim on direct appeal was that the trial court erroneously prevented his counsel from pursuing the "opt-in" defense to the CAN-SPAM Act violation. *Rad*, 559 F. App'x at 150. As the Third Circuit noted on Petitioner's direct appeal, the trial court's denial of Petitioner's interpretation of the CAN-SPAM Act's "transactional or relationship" message exception, was an appropriate ruling. *Rad*, 559 F. App'x at 150-51. Moreover, the Third Circuit characterized the defense as one "that was lacking in support, as a matter of law, so as to be misleading to the jury." *Id.* at 151.

Petitioner now argues that trial counsel repeatedly advised him that the emails in question's "transactional" nature fell under the exemptions to the CAN-SPAM Act. (15-7740, ECF No. 1-5 at 10). Trial counsel, Francis Williams Montenegro, Esq., filed an affidavit in response to this ineffective assistance claim, where he unequivocally denied that he "guaranteed or promised" that Petitioner would prevail at trial. (15-7740, ECF No. 12-11 at 3).

Petitioner argues that the failed defense strategy motivated his decision to reject a plea offer. The Sixth

Amendment right to counsel extends to the plea-bargaining process, *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012), and claims arising out the plea process are governed by the two-part *Strickland* test. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

The record reflects that Petitioner became aware of the trial court's rejection of the CAN-SPAM Act exemption after trial had commenced. (15-7740, ECF No. 12-3 at 32-36). On the second day of Petitioner's trial, the trial court gave its reasoned decision for why Petitioner's interpretation of the CAN-SPAM Act was invalid. Moreover, it instructed the jury to disregard any opening arguments or testimony about a possible "opt-in" exemption to the statute. (11-cr-161, ECF No. 82 at 10-11).

Almost immediately after the court's decision, trial counsel requested a brief recess to convey the contents of a conversation it just had with the prosecution, to the Petitioner, which the court agreed to. (*Id.* at 9).

The record also indicates that shortly after the trial court's refusal to allow the exemption defense, the prosecution asked the trial court to engage in a second colloquy with Petitioner confirming that plea negotiations occurred and that Petitioner articulated that he knowingly rejected the government's plea offers. The record is unclear about whether the negotiations referenced in the colloquy include any offer

30

extended after the court's decision to prohibit the exemption defense.

At this juncture, the Court needs further information in order to make a determination that counsel's representation fell below an objective standard of reasonableness pursuant to *Strickland*. The Court will hear evidence about whether counsel's failed defense strategy constituted deficient performance and what if any prejudice Petitioner suffered as a result of purportedly rejecting a plea offer on this reliance. *See United States v. Tolliver*, 800 F.3d 138, 142 (3d Cir. 2015) ("[W]here there are disputes of material fact, the first step is to hold an evidentiary hearing.") Therefore, an evidentiary hearing on this claim will be ordered. Petitioner will be appointed counsel to represent him at this hearing.

## Counsel's Failure to Advise Petitioner of the Potential Sentence Exposure

Petitioner also claims that trial counsel "failed to communicate any information relating to Movant's potential sentencing exposure if convicted at trial versus the benefits of accepting the government's plea offer." (15-7740, ECF No. 1-5 at 12).

Respondents argue that the November 1, 2015 affidavit, submitted by Petitioner and purportedly signed by his trial counsel, indicates that the potential immigration-related

31

collateral consequences led to Petitioner's reservations in accepting the government's plea offers, and this undermines his claim that he rejected the plea offers because he was unaware of the sentencing exposure. (15-7740, ECF Nos. 50 at 52 and 5-2 at 1).

In his traverse, Petitioner submits that he was not aware that he was facing a potential thirty-seven-year sentence, which he characterizes as a life sentence, and that counsel's incorrect advice about possible deportation spurred his decision to reject the plea offer.[5] (15-7740, ECF No. 51 at 19-20).

"Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).

This Court has reviewed the two written plea offers extended by the prosecution. One of the two written plea offers reflects that the maximum sentence for one of the six statutes for which Petitioner was charged with violating was five years. The plea offer dated November 8, 2012, provides the statutory sentencing maximum, five years, should Petitioner plead guilty

---

[5] Petitioner arrived at the conclusion that his crime of conviction does not subject him to immigration consequences based on his own research. This Court does not make any findings as to whether there are immigration consequences to Petitioner's conviction.

to one count of conspiracy in violation of 18 U.S.C. § 371. (15-7740, ECF No. 12-8 at 3). Petitioner, however, claims that he was never advised of the statutory sentencing maximum on all nine counts charged, and he would have accepted a plea if he had known the maximum he faced.

The record contains two conflicting affidavits from Petitioner's trial counsel. In the November 1, 2015, affidavit submitted by Petitioner but purportedly signed by his trial counsel; trial counsel stated:

> 3) On or about October 16, 2012, when I showed Rad the government's plea offer, I advised him that he could win at trial based on the above.
>
> (4) He could be deported if he pled guilty to the October 16, 2012 plea agreement that the government offered him.

(15-7740, ECF No. 5-2 at 1).

In the March 21, 2016, affidavit, trial counsel certified the following with respect to the Petitioner's sentence exposure.

> 5) I reviewed the Superseding Indictment with Christopher Rad and, as is my normal practice, informed him of the relevant statutory maximum penalties for each of the charges, and also informed him that, because a sentencing judge could sentence him to consecutive sentences for each of the counts, that he faced significant additional exposure as a result of the new charges.
>
> 7) With respect to Christopher Rad's likelihood of prevailing at trial, I

> informed him that there were viable defenses
> and defense strategies that we could pursue
> at trial; however, as is my normal practice,
> I never guaranteed or promised an acquittal
> at trial.

(15-7740, ECF No. 12-11 at 2).

Petitioner's November 1, 2015, affidavit provided self-serving statements that are curiously absent from the March 21, 2016, affidavit. For example, the November 2015 affidavit indicates that counsel told Petitioner about a proper defense strategy and also that his technical ineptitude prevented him from recognizing that some of the government's witnesses were providing false testimony. (15-7740, ECF No. 5-2). Whereas, the March 21, 2016, affidavit provides an unequivocal statement that counsel did not guarantee Petitioner a victorious trial outcome. (15-7740, ECF No. 12-11 at 3).

Based on the conflicting affidavits, the record does not conclusively show that Petitioner is not entitled to federal habeas relief on this claim. *See Tolliver*, 800 F.3d at 142 (3d Cir. 2015). Therefore, out of an abundance of caution given the two different affidavits, an evidentiary hearing on this claim will be ordered.

### iii. Trial Counsel's Failure to Move for a Post-Verdict Motion of Acquittal was Ineffective Assistance

In Grounds Five and Six, Petitioner alleges that trial counsel's failure to move for a post-verdict judgment of

acquittal on Counts One, Five, Six, Seven, Eight and Nine constituted ineffective assistance. (15-7740, ECF No. 37 at 14). More specifically, with respect to Counts Five through Nine, Petitioner argues that counsel should have advanced the argument that the evidence failed to support that "multiple e-mails had been sent through any specific protected computer, nor that Movant had agreed to do so." (15-7740, ECF No. 1 at 7). The record reflects that trial counsel unsuccessfully moved for judgment of acquittal on all counts twice during the pendency of Petitioner's trial. (11-cr-161, ECF No. 86 at 96). The trial court ruled on Petitioner's first Rule 29 motion for judgment of acquittal after the prosecution presented its case in chief. Petitioner's trial counsel subsequently unsuccessfully renewed his motion for judgment of acquittal after the verdict was delivered. (11-cr-161, ECF No. 76.)

### Judgment of Acquittal on Count One

Petitioner argues that "there was no evidence presented at trial that Movant had agreed to the false registration of any emails." Additionally, he argues that trial counsel failed to move for judgment of acquittal "on count one where the government presented no evidence that any headers were materially falsified." (15-7740, ECF No. 4 at 4, 7).

The trial court denied the motion for judgement of acquittal with respect to count one as follows:

First of all, with respect to the testimony of James Bragg, we have on pages 98 of the record, page 99, 100, 102 through 103 in which Mr. Bragg testified not only about his relationship with Mr. Rad, but also the purpose for that relationship and the mechanism for executing what was described as a securities fraud scheme.

Particularly on page 100, Mr. Bragg testified that Mr. Rad's role was to provide him, Bragg, with stock; that he, Rad was the one in charge of selling the stock after I, Bragg, promoted it and, "QUESTION: Why did he need you to do this?"

His answer was, page 100, line 8, "getting past spam filters and when you're spamming or in that world to get past those filters, you have to have certain knowledge to be able to bypass and get into people's inbox. If you don't know what you're doing, everything goes directly to the spam folder."

On page 101, Mr. Bragg explained the mechanism, line three, "he would paste it in the chat program we were using, word-for-word in the text format." At that point, line 7, "he," Rad, "generally told me the amount of shares we needed to move, then I would base the mailing on that. I would load the e-mail message that he's given me into my e-mail software, my e-mail software would then go out to the larger ISP's as hotmail, gmail, yahoo and it would create e-mail accounts, fictitious e-mail accounts and send the e-mail through those accounts."

Page 102, Mr. Bragg testified that "e-mail accounts were set up in randomly-generated names from text files that he "Bragg, "would put into the software.

"QUESTION: Were they false names?

"ANSWER: Yes, they were.

"QUESTION: Were the registration[s] false?

"ANSWER: Yes, they were.

"QUESTION: How many of these did you create?

ANSWER: Hundreds of thousands.

"QUESTION: Did you talk to the defendant about this?

"ANSWER: Yes, I have."

Page 103, Bragg testified that he showed Mr. Rad versions of the e-mail that he had sent out and then we get into what he described as a seed address. This is page 103, line 11.

Page 104, Mr. Bragg was asked how he made up the mailing lists and he said, "ANSWER: A small amount was created by me through building websites to opt-in. The rest were purchased lists I bought on the internet.

"QUESTION: Where did you purchase them from?

Multiple forums, people in general. Anyone that said they had an e-mail list their people would be interested in stock.

"QUESTION: Did you verify, did you take steps to verify those were opt-ins?

"ANSWER: No, I didn't.

"QUESTION: In your experience, were they opt-ins?

"ANSWER: No, they were not."

Clearly through the testimony of Mr. Bragg, who went on to say on page 114, that Mr. Rad had pasted him the actual messages that would be sent, including the disclaimers which described as false disclaimers, because he was misrepresenting the amount of shares which were going to be put on the market by the

> conspirators. I disagree that there's
> inadequate evidence to demonstrate a
> conspiracy to commit securities fraud simply
> based upon the testimony of Mr. Bragg.

(*Id.* at 98-101).

Notwithstanding the trial court's reasoned denial based on voluminous documentary evidence and witness testimony during the government's case in chief, Petitioner maintains that the evidence did not support the conspiracy conviction. As respondents point out Petitioner's trial counsel made a comprehensive argument about the insufficiency of the evidence. Moreover, Petitioner's argument is belied by the record which demonstrates that the prosecution met their burden of proving the elements of 18 U.S.C. § 371, conspiracy to commit crimes against the United States (Securities Fraud; False Header Spamming; and False Registration Spamming). (15-7740, ECF No. 50 at 62-65).

## Judgment of Acquittal on Counts Five Through Nine

The trial court also ruled on trial counsel's motion for judgment of acquittal on Counts Five through Nine.

> With respect to count five, whether there's
> sufficient evidence to sustain a conviction as
> to count give, which is a conspiracy to commit
> essentially illegal spamming, we have all of
> the evidence, Government exhibit 1205,
> Government exhibit 1202, 1201, of course,
> which we'll be getting to in a minute, all of
> which, and 1204 and 1200, all of which relates
> to e-mails and Skype chats between Mr. Rad and
> dean. swarowskiy, also known as Ega, which is

the individual set forth in count give of the indictment. So there clearly is evidence which would sustain a conviction as to that conspiracy.

As to the substantive counts, two through four and six through nine, Government exhibit 1201 simple identifies the exhibits in evidence which would support those substantive counts of illegal spamming.

So for those reasons, I do not find that there is insufficient evidence to sustain a conviction and the motion for acquittal is, therefore, denied. So we are ready to proceed?

*Id.* at 101.

Petitioner now argues that counsel should have premised his motion on the insufficiency of the evidence. However, the record belies Petitioner's claim that trial counsel did not already do so. His initial and renewed Rule 29 motions were premised on the insufficiency of the evidence. Moreover, the renewed Rule 29 motion argued specifically: "The Government also did not prove that the Defendant arranged for his newsletter to be sent through unauthorized, protected computers." (11-cr-161, ECF No. 76 at 2.)

The trial court's written denial addressed the insufficiency of the evidence argument as follows:

With respect to his second argument, Defendant argues that "the Government did not produce a single witness who claimed their protected computer was used without authorization" and that the Government's expert "agreed that a system of controlled computers to send email in a legal fashion would operate identically

and appear identical to a system using computers without authorization." Motion at 2. While Defendant is correct that the government did not elicit testimony from any witness whose computer was accessed without authorization (that is, a "botnet" victim), there was evidence produced at trial from which the jury could find that the email campaigns relevant to Counts V through IX were sent though [sic] botnets. *See, e.g.*, Govt. Ex. 1202 (admissions by co-conspirators) and exhibits referenced therein.

(11-cr-161, ECF No. 93 at 3).

Here, Petitioner has failed to meet either prong of the *Strickland* test. First, he cannot show that counsel's performance was deficient, as the record shows that counsel diligently raised a Rule 29 motion twice. Moreover, counsel's motions were denied due to an abundance of evidence that supported the counts of conviction. *See Govt't of V.I. v. Joseph*, 465 F. A'ppx 138, 142 (3d Cir. 2012)("[T]he evidence was sufficient to prove all of the elements of the crime.")

Consequently, Petitioner is not entitled to relief on this basis.

## IV. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Applying this standard, the

Court finds that a certificate of appealability shall not issue in this case on Claims 1, 2, 4, 5 and 6. This Court reserves judgment on whether a certificate of appealability should issue on Claim 3 until after the evidentiary hearing on this claim is completed and this Court issues its opinion on the merits on that claim.

## V. CONCLUSION

For the reasons stated above, Claims 1, 2, 4, 5 and 6 of Petitioner's Motion to Vacate, Correct, or Set Aside his sentence are denied. Petitioner's Claim 3 alleging ineffective assistance of counsel for failure to pursue a sound defense strategy and failure to advise of the potential sentence exposure is reserved for an evidentiary hearing.

Additionally, Petitioner's Motion for Discovery (15-7740, ECF No. 38) and Motion for Partial Summary Judgment are denied. (ECF No. 34). Petitioner's motion for discovery seeks to compel documentary evidence which he argues could support his claim that James Bragg and Agent Allen's testimony was untruthful. Under Rule 6(a) of the Rules Governing Habeas Corpus Cases Under § 2255, "[a] judge may, for good cause, authorize a party to conduct discovery . . . " However, a habeas petitioner is not entitled to discovery if his habeas petition is without merit. See *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987). In

light of the Court's resolution of those claims in this opinion, Petitioner's motion for discovery is denied.

Petitioner filed a motion for partial summary judgement arguing that the government failed to prove an element of the conduct resulting in convictions on counts five through nine of the superseding indictment. (15-7740, ECF No. 34 at 1). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 313 (1986). This matter is addressed in the portion of this opinion addressing the ineffective assistance of counsel claim pertaining to counsel's failure to move for judgment of acquittal on counts five through nine. *See Supra*, Section B, iii. Therefore, Petitioner's motion for partial summary judgment is denied.

No certificate of appealability shall issue. An accompanying Order will be entered.

_9/7/2018_
Date

_Anne E. Thompson_

ANNE E. THOMPSON
U.S. District Judge